My name is Eugene Iredale and I represent the Estate of Alex Martin and his parents Karen and Craig Martin. May it please the court, there are three reasons why we ask the court to reverse the grant of summary judgment in this case. The first has to do with a Ninth Circuit case Coles v. Eagle which specifically sets forth the standard for the conduct of policemen when they are dealing with somebody in a car in a difficult situation. The rule is that they are to give commands and have a right to have those commands obeyed if they are clear and able to be complied with. In this case as in Coles v. Eagle Alex Martin was asked to do six, well in Coles it was only two things, they said get out of the car and keep your hands on the steering wheel. In this case Alex within the span of 16 seconds and this the actions of the agents during this time can be viewed on the videotape which is excerpt of record 88. He was told according to their testimony the following, roll down your window, open the window, show us your hands, raise your hands, get out of the car, get out of the effing car. In order to show his hands and keep them shown he could not open the window or open the door. He was blocked in entirely on the driver's side so if he were going to try to get out he would have to go over the console which in the middle of this small 2010 Ford Focus. If you will watch the videotape you will see the first agent approaching the door. I just wanted to talk to you about it because it shows I think very vividly what was being said and done in a massive, quick, confrontative way. Your time is ticking and we've watched the videotape. Can I get you to the questions that are going to be most helpful to me? Of course. I just really want to give you an opportunity to respond. I'm curious about where we should pick up the action because in EGLE it's a very different precursor. So from the time and specifically I wouldn't know what your answer is please to whether or not we should consider the conduct of Mr. Martin as he passed through the border patrol station. I mean the officers knew that so what do we do with that information? It wasn't just that they pulled him over for a tail light. I think the test is totality of the circumstances, the very inception of the contact and that you have every right to consider that. And that is a factor that is legitimately considered in the totality of the circumstances. Having said that I also assert with equal vehemence and a great deal more emphasis that the court should also consider the very inception of this contact and it leads me to the second reason why this case should be reversed and sent back for trial and that is the agents in this case lied from the very inception about their contact when they first saw Alex. What you see on the video at the inception of the contact is Salcido's car comes in pulls behind Alex's car and then after approximately five seconds you see Alex's car take off so it looks like he's just fleeing but what we know from the depositions is that all three of those agents got out of their cars, none displayed badges, none identified themselves as agents at the first stop. Yes, we're aware of that. And is it your position that that first stop is fair game to consider? My submission to the court is the court has the right and arguably the obligation to consider the totality of the circumstances including what caused the initial flight and of course Alex's conduct thereafter but in other words I think it's fair for them to say yeah but he went right past the border patrol stop and that shows he knew at that point that they were police not thugs. I think that's a fair inference for them to make. That's a fair argument but I have the right then to say look at the very beginning, two cars and you can see they say they have flashing lights, they're in the back and they don't look like police lights, they're in plain clothes, these people do not look like border patrol agents, they did not display their badges and in this regard the real reason why assembly judgment should absolutely be precluded is because the agents lied, their conduct shows consciousness of guilt. What is your third point? You said you had three and you have the Coles point and the point that you're now making. The third point is this, Cruz versus Anaheim. We can't see on that videotape what movements of hands or body Alex was doing. The agents say, albeit inconsistently, well he was digging in, one of them says he was digging in the console, the other said reaching over, the other said well he was moving his hands about but in this regard if they're going to say well he was making a reach for what we thought was a gun or a weapon, the court has the right to say hold on, just as in Cruz versus Anaheim. Why would he be reaching for a weapon when there is no weapon? And is that not in and of itself putting aside the many falsifications and lies that the agents told? I'm sorry? There didn't turn out to be a weapon but how would they have known that? No, my point, Judge Graber, is something different. My point is they contend he was reaching for a weapon. I think they're lying. But Counsel, Cruz doesn't help you because the sound bite from Cruz you're citing is cited often and read in context. That case is more about the fact that the whole sequence there could not have happened the way the officers described because that individual was found still strapped into his seat belt. He couldn't have gotten out the car the way the police officers described in that case. It's a very different situation than we have here. Well, I read Cruz this way for the proposition that Judge Kaczynski I think very piercingly uttered. Some cases are a case of he said, she said. This is a case of we said, he's dead. And in this case if they're going to rely upon this furtive hand gesture as a basis for doing what they did, I think I have the right to say given your many contradictions, given the absence of anybody who is alive who can contradict that, summary judgment may not be granted in this case on your assertion that an alleged furtive gesture for a weapon that did not exist is the basis. In other words, that you're not telling the truth agents. And as a matter of fact, just before we started today, I watched the video again before your time is gone. I've got a couple of questions I'd like to ask you. So what is the relationship between your 1983 claim and your FTCA claim? So let me let me be more specific. If if I thought that that irrespective of the constitutional merits of your 1983 claim that the officers were entitled to qualified immunity, does your FTCA claim stand? And what would that require you to prove? Yes, your honor. For certain it stands on the negligence claim. The negligence claim would simply require us to prove that the conduct of the agents fell below the standard of care and the negligence claim. The negligence claims are the negligence. It's just general negligence leading to the death of Alex Martin. In other words, the negligence or the factual predicate of the negligence claims would be the initial approach, the failure to display badges, the pointing of weapons at him, which they did not disclose initial. But when they initially approached him in the dark, when they had no basis to do anything but say the taser, one of the is the use of the taser. One of the acts that supports your negligence claim. It is the culmination of the act that supports the negligence claim. But the conduct that they engaged in of a negligent nature, which led Alex to flee in the first instance in their continued conduct and failing to identify and in giving multiple contradictory con commands was also the negligence that led to their use of the taser. I think Judge Bybee had another question. Forgive me. Well, would the negligence claims require us to decide any constitutional questions? It does not. No. As a matter of fact, we laid out in the record clearly what the Border Patrol standards say. They say, for instance, that the stop was... And California permits lawsuits against peace officers based on negligence? Based on negligence, yes. What case do you have for that? Forgive me. I did not cite a case because it was not raised at all. And does California afford defenses to police officers on negligence? It does. It says if they are acting in a reasonable fashion, then they are not negligent. And it also gives some discretionary component, Judge Bybee. In other words, it says, well, the officer is required to adhere to certain standards, but you have to, in judging that conduct, accord a degree of discretion. So the standards against which we would judge this negligence are what? What are the standards for a reasonable Border Patrol agent in this circumstance? So the standards that you're going to apply in the negligence action are unique to peace officers and not to California citizens generally? That's right. When you say unique to peace officers, they would apply... Right. I'm trying to figure out what standards we would judge negligence against. So if a peace officer is just driving on his way to the donut shop and pulls through a stop sign and hits somebody, broadside somebody, he's behaving in the way... We can measure that standard. We know that other California citizens are subject to the same standard. So what standard of care here are these officers required to exercise when they're exercising functions that ordinary citizens don't exercise? Judge Bybee, thank you. And you put to me a question that I had not thought of, but let me try to answer it if I could. One is, and I have not thought about this, but under either standard, we would prevail, I believe, at trial. One, if you just use the reasonable person standard. In other words, forget any unique regulations, the Border Patrol requirements, the Border Patrol training, what they're told is required of them. Just a reasonable person would not approach in the night and pull out a gun and point it at somebody and say, get out of the effing car without identifying their purpose or authority. A reasonable person... In California, the FTCA is designed to make federal employees liable on the same basis as regular persons in the state. Is there anything in California that says you can be negligent if you approach a car and pull a gun out? With no legitimate basis to do so, causing... That's a criminal act. I suppose that you could then be liable for an intentional tort. Where's the negligent tort? Well, as you know, acts can be both intentional and negligent at the same time. Pleaded also assault and battery, as I recall. Now on that, in answer to Judge Bivey's question, no. This court has held that for law enforcement officers with respect to those torts, the standard of reasonableness that applies to 1983, or in this case, Bivens, is the same that applies to those particular torts. But qualified immunity would not apply. That is correct. That is true. My first question was, if I thought that the officers were at least entitled to qualified immunity, does that leave your other torts in place under the FTCA, your other claims? And the answer to my question is yes. Although I would hope, I would beg, I would pray that the kind of conduct you have here, which was clearly against the regulations that they're taught, which is identify yourself... Counsel, you're repeating yourself and you've way exceeded your time. That means I will sit down. Thank you. Okay. We'll give you some rebuttal time, though, because we asked a lot of questions. Good morning, Your Honors. May it please the Court. My name is Daniel Butcher, and I represent the four individually sued Border Patrol agents, as well as the United States. Picking up on the Court's discussion, I believe the best place to start is this Court's Billington case, where the Court distinguished between police officer conduct that led up to the use of force that can be considered a constitutional violation, which then can support liability under Bivens for a subsequent use of force when the officer acts unconstitutionally and gets him or herself into a position where the use of force becomes necessary. And a situation where the officer's actions that lead up to the use of force can, at best, be considered negligence. Counsel, I'd like to, if I may, just ask you the thing that is of most concern to me. It appears to me that there is at least a triable question of fact as to whether the amount of force used was excessive. And if, you may or may not agree with that, but I'd like you to accept that as the premise of my follow-on questions. If qualified immunity is nonetheless available because of lack of clearly established law, what survives of the tort claims is similar to what Judge Bybee was pursuing, but would that leave the assault and battery claim in place? So if your Honor's question is, let's assume that there's a Fourth Amendment violation in light of the level of force that was used, but there's qualified immunity because that constitutional violation was not clearly established, then I believe that the assault and battery claims do survive in that situation, Your Honor, quite frankly. So if we were to decide on the Bivens claims on qualified immunity grounds, we would still have to decide the Fourth Amendment claims, and there would be no qualified immunity from a tort action under the FTCA? Well, that's correct. I'm not sure I quite understand Your Honor's question, but if Your Honor's posing the question posed by Judge Graber, which is, let's assume that qualified immunity applies, but the reason it applies is because the second prong is not present here. In other words, there was not clearly established law that established that the use of force was unconstitutional, but the court in the first instance finds, yes, this conduct did violate the Fourth Amendment. Could violate the Fourth Amendment. Could violate the Fourth Amendment. Then I think we do have surviving tort claims in that case. Yes, Your Honor. Which ones? Are there any that survive besides the assault and battery in that scenario? Well, certainly I think the negligence claims would survive in that scenario. I'd have to give some more thought and perhaps submit some additional briefing to the court on the assault and battery. But I suspect, again, without having researched the issue, that they would survive in that situation when there's an excessive use of force that was unjustified. And non-privileged. The Coles decision, I think, had not been issued at the time these officers acted. Is that right? That's absolutely correct, Your Honor. So that cannot constitute clearly established authority that guides the officers in this case. That was my question. My question is now it has issued. If this were to happen today, would you agree that there is now clearly established law that simply not complying with inconsistent instructions is not sufficient cause for use of even intermediate force? So, first of all, with respect to the inconsistent instructions, I regard those as not constitutional violations, perhaps negligence. In the Coles case, the inconsistent instructions were analyzed in the framework of the Graham analysis, the Graham factors, where the court found we couldn't say for sure that there was active resistance here because of the inconsistent instructions. Because it was impossible to comply. That's what Judge Teshima wrote for the court. He said it was impossible to comply with the direction to both keep your hands, I think, on the steering wheel and also to get out of the car. Yes. Right? Yes. Okay, so if we were to just decide that the instructions here, and I think there were five or six different instructions, some in English, some in Spanish, certainly a very confused situation. But if we were to decide in a hypothetical that it was not possible for Mr. Martin to comply with the instructions, is there now clearly established law establishing that the use of intermediate force would not be warranted on that basis alone? I don't believe so, Your Honor. Everything is fact-specific. That's the thing about all these cases. That's why I'm giving you a hypothetical. Yes. And in this case, we have more than that because Mr. Martin had traveled at a very high rate of speed because he'd gone through the border patrol station. I understand that. But I really am asking you to suspend reality and focus on that hypothetical, if you would. Well, I think with the conflicting instructions as one of the factors that weigh into the Graham analysis, it doesn't necessarily mean that even if there are conflicting instructions, then the use of force would be unreasonable in every circumstance. Why not? Because the other Graham factors could weigh in favor of the use of force, and they'd have to look at the level of the force that was employed. But I'm asking you to consider that, simply answer the question. Maybe you can't. Maybe you won't. But I'm having a hard time understanding why use of force, even intermediate force, would be warranted if the problem the officers are going to complain about is the failure to comply with inconsistent instructions. Well, I think, again, it depends on the severity of the crime. It depends on whether the officers feel that their lives are at risk or there's a danger. Or if you're chasing someone who's just committed an armed robbery and you think there's still a gun in the car, the answer might be different. Absolutely, Your Honor. That's exactly my point. Forgive me, but coals in this case both involve traffic incidents. That's what was, if I didn't make that clear. I'm talking about in the confines because we see this a lot where a car is pulled over for some kind of a traffic violation, and that's very concerning because it's not uncommon for us to hear that inconsistent instructions were given by the police officers under those circumstances. In this case, deadly force wasn't used. Intermediate force was used. I think we need to be careful about what's an inconsistent instruction and the difference between inconsistent instructions and multiple instructions. There's no evidence in this case that the instructions, inconsistent instructions, were given simultaneously to confuse the plaintiff. Well, maybe not with the purpose to confuse, but they were given in very rapid succession, right? In response to rapidly unfolding events. We know that initially... Is it your position that those instructions given in this case were not inconsistent, that he could have complied with all of them? Absolutely. How would he have done that, sir? Well, initially, Mr. Martin had his hands up. At that point, it would be reasonable to say, okay, he complied with that instruction. The next instruction is get out of the car. And what does he do next? Reaches for the center console. At that point, instead of getting out of the car and complying with that instruction, the officer is going to say, wait a minute, we can't see your hands any longer. It doesn't look like you're getting out of the car. Put your hands back up, and he's going to get yet another instruction. And I would submit that happens in a majority of cases of this type, where multiple instructions are given that may not be the same, but the officers are reacting to what they see and the changing circumstances. And under the totality of the circumstances here, I think the court needs to understand and appreciate that there was going to be no easy way to extract Mr. Martin from this vehicle. And this was a circumstance of his own making. And I disagree, by the way, with the court that this was a stop for a traffic violation. It was not. Again, I think the hypothetical is not one you want to engage in, so it's not going to be productive. But what I'm telling you is that we see cars. It's not uncommon. Maybe it's a high-speed chase, but not an armed robbery. We see this situation pretty commonly, and the scenarios where a car is pinned in and multiple inconsistent instructions are given. This case happened in a different scenario, and this case happened post Coles. So we can leave it at that. Very well. I believe here, again, if I can please wrap up. A straightforward application. I mean pre-Coles. Yes. I understood, Your Honor. And to that point, if the court looks at the precedent from the circuit that was in place before this incident took place on March 14th, carrying over to March 15th of 2012, we have the Bryan case, which was in 2011. All that would go to the question of qualified immunity. Yes, Your Honor. Not to the reasonableness of the stop. So are you asking us to decide this on qualified immunity grounds and allow the FTCA claims to go forward? No, no. I believe that there's no FTCA claim valid either. What's your strongest argument that the stop was constitutional, that there wasn't a constitutional violation? For the initial stop. For the second stop. For the second stop. Yes. So at that point, the agents had ample reasonable suspicion to believe that criminal activity was afoot. Agent Fishman had seen a wrong-way driver in the proximity of the checkpoint of Interstate 8. Agent Fishman and the other agents know that's a frequent. And would that entitle them to use intermediate force? Not alone. Not standing alone, no. But it certainly, in terms of the first gram factor, establishes that there is a serious crime that is under consideration here, and they need to be on the lookout for that. It seems to me that the circumstances were very different for the first stop and maybe even a whole lot more egregious. But then, even if this individual felt that he was being pursued by thugs, and it was, after all, it was very dark, it was very late, they jumped out, there were three of them, they pointed guns, it could be a very frightening situation, but there's this intervening event, right? There's a, it seems to me, a break in the proximate causation, which is why I asked you to look at the second stop, because he went through a border patrol station, and there was an opportunity there for safe haven. Go ahead. And he didn't take advantage of the safe haven. Right. So don't we need to look at the constitutional violation from that point forward, from the point of the border patrol station forward, to determine whether or not the force was reasonable? Well, absolutely. But it's viewed in totality of the circumstances. The individual who had fled the officers required spike strips at the checkpoint, where he didn't stop, where he could have if he suspected that he was being pursued by robbers or thugs, kept going. And I would submit to the court as well that the danger, there was a danger all the way through this, but at no point in time was the danger greater than after the officers surrounded the car and then left the relative safety of their car and were confronting a subject they had no idea what they were up against, whether they were guns, there were bombs, or, in this case, completely unforeseeable to them. The car was essentially a ticking time bar primed to explode through gasoline fumes. Forgive me for interrupting. I didn't mean to. One of opposing counsel's arguments is that he thinks that these officers were not truthful and that they didn't identify themselves as police officers, which made the situation more dangerous, and that the video shows them then flipping their badges, taking their badges out and displaying them. What should we do with those circumstances, sir? Well, the court could consider them in the totality of the circumstances, but, again, we have the video. What do we do with them? I would suggest nothing because the argument there is that the failure to display badges somehow caused Mr. Martin to be confused as to whether he was dealing with law enforcement or some people who were up to no good. And based on what we see in the video, the plane, we see the sirens, we see the Border Patrol checkpoint, we see a marked Border Patrol unit pointed toward Mr. Martin with its lights flashing. I think your argument is, again, the time. I think your argument is at least as of the time he went through the Border Patrol station, there couldn't have been any reasonable confusion about whether he was dealing with officers. I'm not trying to put words in your mouth. That's absolutely my argument. And then at that point, any failure to display badges before that time didn't proximately cause or lead to anything that happened after that. Thank you, counsel. Thank you. Mr. Ardale, you may have a minute for rebuttal. Yes, Your Honor. With respect to the issue of qualified immunity, the law was crystal clear. At the very beginning, these officers had an obligation to identify themselves as law enforcement. You see, because I know the court has seen the video, they don't look like police officers. Their cars do not look like police cars. But he's been through a checkpoint, and he's blown through the checkpoint over the spike strips. He went around the spike strips. He's got uniformed officers and marked cars there. By the time you get to the second stop. Yes, I appreciate that. And the court can consider that. I agree with that. But understand that the very inception of this was caused by three armed people coming without identification, without badges, pointing guns at him at the initial stop and saying, get out of the effing car, and that caused it. That's what starts the sequence of events. But you can't ignore the, and we don't forget that these are very tragic circumstances, counsel. But there's this border patrol station, and he did drive right through it. So after that point, is it your position that Mr. Martin was confused about who was chasing him? What I'm saying is that the agents from the very beginning created a fatal ambiguity because of their refusal or failure to identify themselves. That actually doesn't answer the question. I think Judge Christen's question was whether a reasonable person could have thought after the border patrol station that the people pursuing were not border patrol agents. And the answer to the question would be a reasonable person in the light of day with no fear would clearly have perceived that. And a young man, 24 years old, after having driven 23 hours in a row in these circumstances in the dead of night, having been threatened by people that he did not know who could have been thugs pointing guns for no reason, may or may not have perceived that through his panic. That's the best answer I can give. And that emphasizes the tragic nature of the incident. But the officers are not responsible for the fact that he's driven 22 hours or that he's confused or that he's 24 because they don't know any of those things. That is correct. But the officers are responsible for their failure, their deliberate failure, to identify themselves either by saying border patrol or holding up a badge. They are responsible for pointing guns at him when there was nothing other than a potential traffic stop and telling him to get out of the effing car. And they are responsible when they are interviewed by homicide to tell the truth and they lied when they said, oh, yes, we displayed our badges. When we see on the videotape that during the incident, no badges were displayed and they pull it out furtively by the side. And none of those three officers, when initially interviewed, ever admitted that this whole thing began when they jumped out of their cars, pointed guns at him and said, get out of the effing car. Counsel, we have your argument. Thank you. Forgive me for any undue excitement. I apologize. The case just argued is submitted, and we appreciate very much the arguments of both counsel. They've been very helpful.
judges: Graber, Bybee, Christen